UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHERYL GIBBS,                                    :

              Plaintiff,         :            07 Civ. 10563 (GBD) (AJP)

      -against-                           :            **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of               :
Social Security,
                            :

            Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable George B. Daniels, United States District Judge:**

        Pro se plaintiff Cheryl Gibbs brings this action pursuant to § 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of

Social Security (the "Commissioner") denying Gibbs disability insurance benefits and supplemental

security income ("SSI") benefits.  (Dkt. No. 2: Complaint.)  The Commissioner has moved for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 8: Notice of Motion; see also

Dkt. No. 11: Am. Answer; Dkt. No. 9: Comm'r Br.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be GRANTED.

H:\OPIN\GIBBS

## FACTS

### Procedural Background

On March 12, 2003, plaintiff Cheryl Gibbs applied for disability insurance benefits and SSI benefits alleging that she had a disability since July 21, 2000.  (See Dkt. No. 10: Administrative Record filed by the Commissioner ["R."] at 42-44, 140-43.)[1/] Gibbs claimed that she could not work because of a back injury, asthma, carpal tunnel syndrome and anxiety attacks.  (R. 51.) Gibbs' application was denied initially (R. 32-36, 144-45), and Gibbs requested a hearing before an Administrative Law Judge ("ALJ").  (R. 39-41.)  ALJ Newton Greenberg held a hearing on August 11, 2004, at which Gibbs testified.  (R. 162-71.)  On October 7, 2004, ALJ Greenberg issued a decision finding Gibbs not disabled.[2/]  ALJ Greenberg's decision became the final decision when the Appeals Council denied Gibbs' request for review on March 30, 2005.  (R. 6-8.)

---

[1/]  Gibbs previously applied for disability insurance and SSI benefits on August 21, 2000, alleging that she had a disability since July 14, 2000.  (See R. 15, 23.)  The "application was denied through the hearing level in an Administrative Law Judge decision dated July 15, 2002."  (See R. 15, 23.)  Gibbs did not appeal the decision.  (See R. 15, 17, 23.)  ALJ Greenberg's October 7, 2004 decision held that "the doctrine of res judicata bars readjudication of the period from July 21, 2000 through July 15, 2002."  (R. 17.)  At the hearing before ALJ Walsh, Gibbs' representative conceded that because of the prior ALJ decision, the amended onset date would be July 16, 2002.  (R. 354-55.)

[2/]  ALJ Greenberg initially issued a decision on August 17, 2004, finding that Gibbs was not disabled.  (R. 19-26.)  Gibbs, however, did not receive a copy of the decision because it was erroneously mailed to Gibbs' previous address.  (R. 14.)  In addition, due to a clerical error, the decisional paragraph on Gibbs' claim for disability insurance benefits was omitted.  (R. 14.)  Therefore, ALJ Greenberg issued an amended decision on October 7, 2004.  (R. 11-18.)

Gibbs appealed the Commissioner's decision to this court (05 Civ. 5795; <u>see</u> R. 201.) On March 6, 2006, on the parties' stipulation, Judge Daniels vacated the Commissioner's decision and remanded "pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings." (R. 210-12; <u>see also</u> R. 176, 193, 208.)

On April 5, 2006, the Appeals Council vacated ALJ Greenberg's decision and remanded for further proceedings. (R. 208-09.) On remand, ALJ Sean Walsh held a hearing on February 28, 2007, at which Gibbs, a medical expert and a vocational expert testified. (R. 342-416.) On March 26, 2007, ALJ Walsh issued his decision finding that Gibbs was not disabled. (R. 190-200.) ALJ Walsh's decision became the final decision on August 25, 2007, when the Appeals Council found no reason to assume jurisdiction. (R. 172-75.)

The issue before the Court is whether the Commissioner's decision that Gibbs was not disabled is supported by substantial evidence. The Court finds that it is.

**<u>Hearings Before the ALJs</u>**

**<u>Non-Medical Evidence</u>**

Gibbs' Disability Report that she filed in connection with her claim for benefits (R. 50-59) claimed that her disability stemmed from a back injury, asthma, carpal tunnel syndrome and anxiety attacks (R. 51; <u>see also</u> R. 63).

On August 11, 2004 and February 28, 2007, hearings were held before ALJ Newton Greenberg and ALJ Sean Walsh, respectively. (R. 162-71, 342-416.) Gibbs appeared without

4

counsel at the first hearing (R. 164), but was represented by an attorney and a non-attorney representative from the law firm of Binder & Binder at the second (R. 344, 377).[3/]

Gibbs was born on June 30, 1957, and completed high school and six college credits. (R. 67, 164-65, 353-54.)  Gibbs worked at Verizon as a service order representative from 1979 to 1984, and then as a telephone representative until July 2000.  (R. 356-58; see R. 64, 70.)  Gibbs stopped working in July 2000 because she was "constantly getting sick," that is, every three months she became sick with asthma or back pain.  (R. 156; see also R. 51, 63, 165, 356, 358-59, 391.)  Gibbs' work as a telephone representative involved answering phones, handling clients, collecting payments and lifting files weighing no more than ten pounds.  (R. 52, 64, 71.)  In a typical work day, Gibbs sat four hours, walked two hours, stood one hour, kneeled one hour, crouched one hour, handled, grabbed or grasped big objects one hour, and wrote, typed or handled small objects three hours.  (R. 52; see also R. 65, 71.)

Gibbs testified that she sometimes had difficulty walking, had difficulty climbing stairs, could not bend from the waist without pain, and experienced shortness of breath.  (R. 363-64.)  Gibbs said that she could stand comfortably about ten minutes, sit comfortably fifteen to twenty minutes and pick up five pounds[4/] without pain.  (R. 158, 364.)  Later in the hearing, however, Gibbs testified that she could sit for thirty minutes to an hour before she needed to stand for about five

---

[3/]    On March 5, 2002, Gibbs appeared without counsel before ALJ Michael Friedman in reference to her July 14, 2000 application for disability insurance benefits and SSI benefits. (R. 152-61.)

[4/]    In her Disability Report, Gibbs said she could not lift over 15 pounds.  (R. 51.)

minutes or less, and then she could sit back down.  (R. 383.)  Gibbs testified that she took the bus

to see her doctors two to three times each week.  (R. 169.)  Gibbs experienced right knee pain since

2006, and took Motrin and Relafen for pain relief.  (R. 361.)  Gibbs took Advair and Albuterol for

asthma (R. 361), but did not have a nebulizer (R. 157, 363).  Gibbs testified at the August 11, 2004

hearing that she had anxiety attacks "every time [she] would get on the subway or whatever."  (R.

167.)  By the time of the February 28, 2007 hearing, however, Gibbs no longer suffered from anxiety

attacks; the condition resolved itself after Gibbs had been going to therapy twice a week.  (R. 361.)

Gibbs testified that she had carpal tunnel syndrome and that, about once each day, she suffered about

five minutes of numbness in her right hand.  (R. 383-84.)  Gibbs stated that she had not received

treatment for her carpal tunnel syndrome because she refused to have an operation.  (R. 384.)  Gibbs

testified that she had undergone an angioplasty with the placement of a stent.  (R. 166.)  Gibbs'

medications included Theophylline, Vanceril, Albuterol, Ibuprofen, Daypro and Alprozolan. (R. 56;

see also R. 67, 122.)

       Gibbs testified that she prepared meals, cared for her cats, went for a walk or traveled

three blocks to the store, washed dishes, did laundry and helped her kids with their homework.  (R.

81-84, 159.)  Gibbs read, watched television and listened to the radio daily, and she played cards

once a week.  (R. 84-85, 159.)  Gibbs would go out four times a week, by herself, and can use public

transportation by herself.  (R. 83.)  Gibbs said that she sometimes needed help putting on her socks

and shoes, and getting in and out of the shower and bath.  (R. 81.)  She would take a nap during the

afternoon because she had trouble sleeping at night.  (R. 382.)

**Medical Expert Testimony at the Hearing**

_____Dr. Harold Bernanke testified at the February 28, 2007 hearing.  (R. 260-61, 351-53, 365-68.)  Based on the medical records in evidence and Gibbs' testimony, Dr. Bernanke stated that although Gibbs would have some difficulty walking because of her knee (R. 366), he did not understand why Gibbs would have difficulty sitting for any length of time  (R. 365).  Dr. Bernanke stated that Gibbs had a history of asthma and had undergone surgery for pulmonary sequestration on her right lung.  (R. 366.)  In 2000, Gibbs  had a cardio catheterization at St. Luke's Hospital; the results were negative.  (R. 367.)  Thus, Dr. Bernanke determined that Gibbs' impairments alone or in combination did not meet or equal one or more of the Listings.  (R. 365.)  Gibbs' representative agreed that Gibbs' conditions did not meet or equal a Listing.  (R. 368.)

**Vocational Expert Testimony**

_____Vocational expert Edna Clark testified at the February 28, 2007 hearing.  (R. 368-77, 385-90, 392-94, 397-415.)  Clark characterized Gibbs' job – customer service representative – as a sedentary, skilled job that involved lifting or carrying items no heavier than five pounds, and no walking, climbing stairs or bending.  (R. 368-70.)  ALJ Walsh asked vocational expert Clark a hypothetical question:  whether Gibbs' past work could be done by a younger person with a twelfth grade education who could not walk, climb stairs, or bend; needed a reasonably clean air environment; could lift, carry, push or pull no more than five pounds; and would require a sit/stand option because the person could sit for half an hour to an hour and would have difficulty standing more than fifteen minutes at a particular time.  (R. 369-70.)  Clark responded that such a person

could perform Gibbs' past relevant work, or (at step five) other sedentary jobs in the national or regional economies, including bench assembly worker, surveillance system monitor and entry-level clerical worker . (R. 370, 372-74, 398, 400-01, 413-15.)  In response to a hypothetical from Gibbs' attorney, Clark stated that if the person could sit continuously only fifteen minutes, stand continuously only ten minutes and walk only three blocks, the person could not perform Gibbs' past relevant work or other sedentary jobs.  (R. 373.)

**Medical Evidence Before the ALJs**[5/]

### Back and Knee Pain

On April 8, 2003, consultative physician Dr. Michael Polak of DHS examined and evaluated Gibbs.  (R. 96-97.)  Gibbs indicated that she had "left lower lumbar pain, which radiates to the left hip." (R. 96.)  Gibbs told Dr. Polak that she could not bend or pick up heavy objects. (R. 96.)  Dr. Polak noted that Gibbs walked with the assistance of a cane, but could walk without it. (R. 97.)  Gibbs told Dr. Polak that she lived on the third floor of a building without an elevator. (R. 96.) Gibbs had no difficulty transferring from a seated position on and off the examining table, and was able to perform flexion to fifty degrees, extension to ten degrees, left and right lateral flexion to thirty degrees, right negative at twenty-five degrees and left negative at seventy-five degrees.  (R. 97.) Dr. Polak noted that Gibbs could stand on her heals and toes.  (R. 97.)  Gibbs had been taking Naproxen and Celebrex twice a day. (R. 96.) Dr. Polak diagnosed Gibbs with "[c]hronic back pain,

---

[5/]    The Court notes that, except as to Dr. Enu (see page 24 & n.10 below), Gibbs' representative did not assert to ALJ Walsh or the Appeals Council that any medical records were missing from the record or needed to be obtained.

rule out lumbo sacral degenerative joint disease." (R. 97.) As to Gibbs' "[f]unctional capacity to do work related activities," Dr. Polak opined that "[b]ased on [Gibbs'] history and physical examination," Gibbs "would be mildly impaired doing activities requiring: carrying/lifting, pushing/pulling, bending, sitting, walking or standing." (R. 97.)

On April 9, 2003, Dr. Lawrence Liebman interpreted a radiographic examination of Gibbs' lumbosacral spine. (R. 94.) Dr. Liebman reported that "[t]here [was] marked narrowing of the L5-S1 disc space" and "[g]rade II spondylolisthesis of L5 over S1 with associated spondylolysis at the L5 level." (R. 94.) Dr. Liebman observed intact pedicles and no compression fracture. (R. 94.)

On May 6, 2003, a doctor (whose signature is not legible) completed a "Physical Residual Functional Capacity Assessment" of Gibbs. (R. 100-05.) An x-ray of Gibbs' spine "revealed spondylolisthesis and spondylolysis." (R. 101.) The consultative physician concluded that Gibbs could occasionally lift or carry up to twenty/fifty pounds and frequently lift or carry twenty-five pounds, could sit, stand, or walk about six hours in an eight hour day, and was unlimited as to push or pull activities. (R. 101.) The consultative physician also concluded that Gibbs could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 102.) The consultative physician found that "based on the objective physical findings," Gibbs' allegations (back pain and limits on sitting and standing, lifting, etc.) were "not credible." (R. 104.) The consultative physician found Dr. Polak's opinion (see pages 7-8 above) "consistent with all the evidence in [the] file and is adopted," although he seemed to believe Dr. Polak was a treating doctor (see R. 104.)

On May 16, 2003, Gibbs was treated at Harlem Hospital Center after falling on her left buttocks. (R. 120.) An x-ray revealed no fracture. (R. 120.) Gibbs complained of persistent lower back pain and was referred for physiotherapy. (R. 120.)

On February 2, 2004, HS Systems, Inc., a rehabilitative service, diagnosed Gibbs with a controlled unspecified backache. (R. 125.) HS Systems opined that the backache "should not interfere with [Gibbs'] ability to work." (R. 125.)

On April 28, 2006, Gibbs' treating physician Dr. Huma Masood completed a "Physician's Report of Disability Due to Physical Impairment." (R. 271-76.) Dr. Masood's report indicated that Gibbs had been treated with Ibuprofen and physical therapy. (R. 273.) Dr. Masood concluded that during an eight hour day, Gibbs could occasionally carry six to ten pounds, could frequently reach and occasionally bend and squat, but could never climb. (R. 274, 274A.) Dr. Masood determined that Gibbs could frequently use her left foot (or both feet) but never just her right foot for repetitive movements, such as pushing and pulling leg controls. (R. 275.) Dr. Masood noted that Gibbs had mild restrictions in driving a motor vehicle and would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 275.)

On June 26, 2006, Dr. William Lathan conducted a consultative examination of Gibbs. (R. 221-30.) Gibbs reported a history of right knee pain and complained of right knee joint pain for the past year when standing and walking more than twenty minutes. (R. 221.) Gibbs reported that "the pain is aggravated nocturnally as well as when lying recumbent." (R. 221.) Gibbs said that she had been receiving physiotherapy two times each week "with temporary improvement

of symptoms." (R. 221.) Gibbs was taking Relafen and Motrin. (R. 221.) Based on his examination, Dr. Lathan noted that Gibbs "appear[ed] to be in no acute distress," had a "limp favoring the right leg," and could not walk on her heels and toes. (R. 222.) Although Dr. Lathan reported that Gibbs used and required a cane for balance, he noted that Gibbs did not need help changing for the exam, did not need help getting on and off the examining table, and was able to rise from the chair without difficulty. (R. 222.) Dr. Lathan noted that Gibbs could "perform all activities of personal care." (R. 222.) Dr. Lathan reported the following about Gibbs' musculoskeletal system: "Lumbar spine show[ed] full flexion, extension, lateral flexion and full rotary movement bilaterally. Straight leg raising negative bilaterally. Full range of motion of shoulders, elbows, forearms and wrists bilaterally. Full range of motion of hips, knees and ankles bilaterally." (R. 223.) Dr. Lathan also found no muscle atrophy. (R. 233.) Dr. Lathan also found "moderate crepitation on active flexion and extension at the right knee joint." (R. 233.) Dr. Lathan diagnosed a "[h]istory of right knee arthralgia" with a "[s]table" prognosis. (R. 223.) Dr. Lathan concluded that there was a "moderate restriction for activities requiring stooping, squatting, kneeling and prolonged standing and walking." (R. 224.)

On September 5, 2006, Gibbs' treating orthopedist Dr. Elton Strauss completed a "Physician's Report of Disability Due to Physical Impairment." (R. 264-70.) Dr. Strauss treated Gibbs from January 2006 through September 2006 (R. 264) and prescribed physical therapy and Motrin (R. 266). Based on an August 2006 magnetic resonance imaging ("MRI") scan, Dr. Strauss diagnosed Gibbs with an osteochondral defect of the right knee lateral compartment. (R. 264-65.)

Gibbs' signs included muscle atrophy and decreased motion. (R. 265.) Dr. Strauss concluded that, during an eight hour day, Gibbs could sit continuously one hour in a normal seated position; stand continuously thirty minutes at a work station without moving; and walk continuously thirty minutes. (R. 267.) Dr. Strauss found that Gibbs would have to lie down one hour every eight hours. (R. 266.) In addition, Dr. Strauss opined that Gibbs could lift or carry continuously up to five pounds and occasionally six to ten pounds, but could never lift or carry eleven or more pounds. (R. 267-68.) Dr. Strauss concluded that Gibbs could occasionally bend and reach, but could never squat, crawl or climb. (R. 268.) Finally, Dr. Strauss stated that Gibbs could use her left foot continuously and the right foot or both feet frequently for repetitive movements. (R. 269.) Dr. Strauss noted that Gibbs would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 269.)

### Asthma

On April 8, 2003, Gibbs reported to consultative physician Dr. Polak a fifteen year history of asthma with two hospitalizations and three emergency room visits for acute asthma within the previous two years. (R. 96.) Gibbs was taking two puffs of Albuterol every six hours. (R. 96.) Gibbs admitted to smoking half a pack of cigarettes per day for twenty years, as well as smoking marijuana. (R. 96.) Dr. Polak found that Gibbs' lungs were clear with "[n]o wheezes, rhonchi or rales." (R. 96.) Gibbs' pulmonary function test revealed that she had "mild restrictive airway disease, which is irreversible." (R. 97.)[6] Dr. Polak diagnosed Gibbs with asthma and cautioned

---

[6] Gibbs' FEV1 (i.e., Forced Expiratory Volume) exceeded 1.05 liters. (R. 95.)

Gibbs to "avoid exposure to dusts, chemicals, smoke and noxious inhalants and extremes of cold and heat."  (R. 97.)

The May 6, 2003  "Physical Residual Functional Capacity Assessment" (R. 100-05) found Gibbs' lungs to be clear bilaterally (R. 101), but also indicated that Gibbs should avoid concentrated exposure to extreme cold or heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation (R. 103).

On July 24, 2003, Gibbs underwent a computerized tomography ("CT") scan of her chest, which revealed  a "4.9 x 4.6 cm spiculated mass in the right lower lobe consistent with a primary lung neoplasm."  (R. 137.)  Dr. Maitland, however, could not rule out "local extension of the neoplastic process or a satelite [sic] lesion."  (R. 138.)

On February 2, 2004, HS Systems diagnosed Gibbs with an uncontrolled "lung field ([c]oin lesion lung)" and controlled asthma.  (R. 125.)[7]  HS Systems recommended a three month rehabilitation plan starting February 10, 2004.  (R. 125.)  HS Systems concluded that Gibbs' asthma "should not interfere with [Gibbs'] ability to work."  (R. 125.)

On June 15, 2004, Gibbs' pulmonary function test results were normal except for a "flow volume loop with obstructive (early) contour."  (R. 334.)  The technician noted that Gibbs often had a productive cough and that, upon exertion, Gibbs usually experienced shortness of breath. (R. 337.)

---

[7]    Gibbs' FEV1 exceeded 1.05 liters.  (R. 335.)

H:\OPIN\GIBBS

On July 21, 2004, Gibbs received a chest CT scan that revealed a right lower lobe lung mass that was "mostly cystic," but also contained "multiple enhancing septations and a more solid component inferiorly." (R. 332.) "Etiologies include[d] cavitating lesions[,] . . . pneumatoceles, congenital cysts . . . . Less likely etiologies include[d] [a] tumor . . . or infectious etiologies such as staphylococcus abscesses . . . ." (R. 332.)

On August 17, 2004, an RN and a physician at North General Hospital completed an "Initial Interdisciplinary Assessment" of Gibbs. (R. 304-11.) Gibbs indicated that she did not walk up flights of steps. (R. 304.) The assessment revealed that Gibbs had a history of asthma and back problems. (R. 306.) The pulmonary testing and cardiac catheterization results were normal. (R. 310.) The same day, Gibbs underwent a right thoracotomy and a right lower lobectomy. (R. 302, 312-14.) The postoperative diagnosis was a "[l]arge abscess, right lung lower lobe, most likely secondary to necrotic infected intrapulmonary sequestration." (R. 312.) On August 27, 2004, Gibbs was discharged and instructed not to carry heavy loads. (R. 301.) Gibbs was diagnosed with "right lower lobe lung: intralobar sequestration, right lower lobe, with acute and chronic inflammation." (R. 321, 324, 327.)

On April 28, 2006, Dr. Masood diagnosed Gibbs with right trochanteric bursitis, bronchial asthma and status-post pneumonectomy (R. 271), and treated Gibbs with Advair and an Albuterol inhaler (R. 273). Dr. Masood concluded that Gibbs had no "restrictions involving . . . [e]xposure to marked changes in temperature and humidity" and moderate "restrictions involving . . . [e]xposure to dusts, fumes, gases, noxious odors and poor ventilation." (R. 275.)

On June 26, 2006, Gibbs reported to consulting physician Dr. William Lathan a history of right lung surgery and bronchial asthma. (R. 221.) Gibbs had undergone a partial right pneumonectomy after being diagnosed with congenital pulmonary abnormality. (R. 221.) Gibbs had been using Advair and Albuterol inhalers. (R. 221-22.) Gibbs stated that she smoked cigarettes and drank alcohol occasionally, but denied the use of "street drugs." (R. 222.) Dr. Lathan found Gibbs to have "[n]o significant chest wall abnormality" and a "healed right posterior lateral thoracotomy incisional scar." (R. 222-23.) Dr. Lathan noted that the results of the pulmonary function test were invalid because of poor reproducibility (R. 223, 225), and recommended that Gibbs "avoid smoke, dust and noxious fumes" (R. 224).[8]

On September 5, 2006, treating physician Dr. Strauss determined that Gibbs had no "restrictions involving . . . [e]xposure to marked changes in temperature and humidity" nor "[e]xposure to dusts, fumes, gases, noxious odors and poor ventilation." (R. 269.)

On September 14, 2006, Gibbs' treating pulmonologist Dr. Rahman completed a "Physician's Report of Disability Due to Physical Impairment." (R. 277-83.) Gibbs' symptoms included shortness of breath and exertional dyspnea. (R. 278.) Dr. Rahman diagnosed Gibbs with sequestration of lung and bronchial asthma[9] (R. 277), and treated Gibbs with Albuterol and Advair inhalers and resection of lung for sequestration (R. 279). Dr. Rahman determined that, during an eight hour day, Gibbs could sit continuously in a normal seated position eight hours; stand

---

[8]    Gibbs' FEV1 exceeded 1.05 liters. (R. 225-30.)

[9]    Gibbs was also diagnosed with "s/p [status post] [r]esection." (R. 277.)

continuously at a work station without moving eight hours; and walk continuously.  (R. 280.)

Dr. Rahman also concluded that Gibbs could occasionally carry eleven to twenty pounds.  (R. 281.)

Dr. Rahman opined that Gibbs did not need to lie down during the day.  (R. 279.)

**Anxiety**

On April 8, 2003, consultative psychiatrist Dr. Richard King of DHS examined and evaluated Gibbs.  (R. 92-93.)  Dr. King indicated that Gibbs had received outpatient treatment at the Northside Community Center for anxiety and depression from 1998 to 2000, and again since 2001, but with "no history of any psychiatric hospitalizations."  (R. 92.)  Dr. King reported the following about Gibbs' mental status: "Affect was fairly well modulated, friendly, and appropriate.  Mood was euthymic, not significantly depressed or anxious.  There were no hallucinations, delusions, suicidal ideations, and ideas of reference or paranoid trends elicited."  (R. 92.)  Dr. King diagnosed Gibbs with "[a]djustment disorder of adult life, anxious and depressed mild degree," and concluded that Gibbs "ha[d] a satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting."  (R. 93.)  Dr. King recommended that Gibbs would benefit from psychiatric treatment.  (R. 93.)

On May 12, 2003, consultative psychiatrist Dr. Richard Nobel examined and evaluated Gibbs.  (R. 106-19.)  Dr. Nobel diagnosed Gibbs with "adjustment disorder of adult life, anxious and depressed mild degree," but concluded that the impairment was not severe.  (R. 106, 109.)  Dr. Nobel determined that Gibbs had no functional limitations, that is, no restrictions of

activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of deterioration. (R. 116.)

On February 2, 2004, HS Systems diagnosed Gibbs with the following controlled disorders: "[d]epressive disorder . . . [n]eurotic disorders . . . [and] [a]lcohol abuse." (R. 125.) HS Systems concluded that these conditions "should not interfere with [Gibbs'] ability to work." (R. 125.)

**Carpal Tunnel Syndrome**

On April 8, 2003, consultative DHS physician Dr. Polak reported that Gibbs' finger and hand dexterity were intact, and that Gibbs had full use of both hands when dressing and undressing. (R. 97.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" indicated that Gibbs had no "manipulative limitations." (R. 102.) On April 28, 2006, Dr. Masood concluded that, during an eight hour day, Gibbs could frequently use either hand for repetitive action, such as handling, fingering, and pushing and pulling arm controls. (R. 274.) On June 26, 2006, Dr. Lathan reported that Gibbs' "[h]and and finger dexterity [were] intact" and that her "[g]rip strength [was] 5/5 bilaterally." (R. 223.) Finally, on September 5, 2006, Dr. Strauss determined that, during an eight hour day, Gibbs could "[c]ontinuously" use either hand for repetitive action. (R. 268.)

**Heart Condition**

On July 22, 2004, Gibbs underwent single photon emission computed tomography ("SPECT") imaging of her heart at North General Hospital. (R. 331, 333.) Gibbs' Radiology Report

17

indicated an "apparent small, mild reversible anterolateral defect extending from apex to proximal ventricle." (R. 331, 333.) The reversible anterolateral defect could represent a "small zone of mild inducible ischemia estimated to encompass less than 5 percent of the left ventricular myocardium" or a "differential breast attenuation artifact." (R. 331, 333.)

On July 29, 2004, Gibbs underwent a "[l]eft [h]eart [c]ath[eteriztion], [l]eft [v]entriculogram, [c]oronary [a]ngiogram[] [and] lleo-femoral angiogram" at St. Luke's Roosevelt Hospital Center. (R. 285-85A, 329-30; see also R. 129.) The procedure revealed normal coronary arteries (R. 130, 285-85A, 329-30), and Gibbs was diagnosed with an unremarkable cardiac catheterization (R. 129). On June 26, 2006, Dr. Lathan reported that Gibbs' heart had a regular rhythm and that "[n]o murmur, gallop or rub [was] audible." (R. 223.)

**The ALJs' Decisions**

**ALJ Greenberg's October 7, 2004 Decision**

On October 7, 2004, ALJ Greenberg denied Gibbs' applications for disability insurance benefits and SSI benefits in a written decision. (R. 11-18.)

ALJ Greenberg reviewed Gibbs' hearing testimony and the medical evidence in the record. (R. 15-18.) ALJ Greenberg found that Gibbs' claims regarding her functional abilities were "not fully credible" (R. 17), and that Gibbs "ha[d] no limitations in activities of daily living, social functioning, and concentration, persistency and pace" and "no documented episode of decompensation" (R. 17-18).

18

ALJ Greenberg noted that Gibbs had been diagnosed with chronic back pain. (R. 17.) The medical evidence indicated that following a fall on her left buttock and leg, Gibbs was examined at the Health Network on May 16, 2003, where an x-ray revealed that there was no fracture, and the doctors recommended physiotherapy. (R. 16.) ALJ Greenberg reviewed Dr. Polak's April 8, 2003 report, which stated that Gibbs walked with the assistance of a cane, but was able to walk without it; Gibbs had no difficulty transferring from a seated position on and off the examining table; and Dr. Polak diagnosed Gibbs with chronic back pain but ruled out lumbosacral degenerative joint disease and found only mild limitations in carrying/lifting, bending, sitting and walking/standing. (R. 16.)

ALJ Greenberg also noted that Gibbs had been diagnosed with asthma and lung mass. (R. 16, 17.) A July 24, 2003 CT scan of Gibbs' chest revealed nodules in the left lower lobe, and a bone scan was recommended to exclude bony metastatic disease. (R. 16.) On April 8, 2003, Dr. Polak found mild restrictive airway disease, and environmental restrictions. (R. 16.) At the August 11, 2004 hearing, Gibbs had testified that she was scheduled to undergo lung surgery on August 17, 2004. (R. 16.) Gibbs further testified that although she had asthma, she could attend to her household chores. (R. 16.) ALJ Greenberg stated that there were no medical records from 2002 and "that both consultative physicians found, essentially, that [Gibbs] could function in the workplace." (R. 16.)

ALJ Greenberg also acknowledged that Gibbs had been diagnosed with mild adjustment disorder. (R. 17.) A July 2, 2004 note indicated that Gibbs was scheduled to see a social

worker on July 30, 2004.  (R. 16.)  On April 8, 2003, consultative psychiatrist Dr. King examined Gibbs, who reported that she could perform routine activities of daily living.  (R. 16.)  After noting that Gibbs' intellectual functioning was average and memory was grossly intact, Dr. King diagnosed Gibbs with "adjustment disorder of adult life, anxious and depressed to a mild degree," but he concluded that Gibbs could function in the workplace.  (R. 16.)

With regard to Gibbs' heart condition, ALJ Greenberg noted that Gibbs underwent a cardiac catheterization on July 29, 2004.  (R. 16.)  ALJ Greenberg did not discuss Gibbs' alleged carpal tunnel syndrome.  (See R. 14-18.)

After reviewing the evidence, ALJ Greenberg performed the appropriate five step legal analysis, as follows: At the first step, ALJ Greenberg found that Gibbs had "not engaged in substantial gainful activity since July 21, 2000."  (R. 15.)  At the second and third steps, ALJ Greenberg found that although Gibbs' chronic back pain, asthma, lung mass and mild adjustment disorder constituted "severe" impairments, they did "not meet or equal a listing in Appendix 1, Subpart P, Regulations No. 4."  (R. 15.)  At the fourth step, ALJ Greenberg found that Gibbs retained the residual functional capacity to "sit for 4 hours, stand/walk for 3 hours and lift up to 10 pounds in an environment free of environmental irritants."  (R. 15, 17.)  ALJ Greenberg found that Gibbs could perform her past relevant work, which he characterized as "sitting for 4 hours, standing/walking for 3 hours and lifting 10 pounds in an environment that was free of environmental irritants."  (R. 17-18.)  ALJ Greenberg concluded that Gibbs was not under a disability as defined

in the Social Security Act at any time since July 16, 2002, and therefore denied Gibbs' application for disability insurance benefits and SSI benefits.  (R. 15, 18.)

### Review of ALJ Greenberg's Decision Leads To A Remand

On March 30, 2005, the Appeals Council denied Gibbs' request for review of ALJ Greenberg's decision.  (R. 6-8.)  As noted above, Gibbs brought an action in this court, and on March 6, 2006, on the parties' stipulation, Judge Daniels vacated the Commissioner's decision and remanded "pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings." (R. 201, 210-12; see also R. 176, 193, 208.)

On April 5, 2006, the Appeals Council vacated ALJ Greenberg's decision and remanded for further proceedings "in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence."  (R. 208-09.)  The Appeals Council noted that Gibbs' "Disability Report indicate[d] that she was treated by Dr. Enu for asthma," yet "the record contain[ed] no treatment records from Dr. Enu or any records of treatment for asthma from any source."  (R. 208.)  The Appeals Council also noted that because ALJ Greenberg's decision was rendered on the same day as Gibbs' scheduled surgery for the removal of a lung mass, there were "no records of treatment for [Gibbs'] lung condition and no records regarding [Gibbs'] status following the surgery."  (R. 208.)  The Appeals Council also noted that Gibbs testified that she "had undergone an angioplasty with [the] placement of a stent," but that the record contained no "treatment records for [Gibbs'] heart condition and her symptoms and functional limitations."  (R. 208.)  The Appeals Council specifically directed the ALJ to "obtain treatment

records and updated medical evidence concerning [Gibbs'] asthma, removal of a lung mass and heart condition." (R. 208.)

### ALJ Walsh's March 26, 2007 Decision

As noted above, on February 28, 2007, Gibbs, Dr. Bernanke and vocational expert Clark testified at a hearing before ALJ Walsh. (R. 342-416; see pages 3-7 above.)

On March 7, 2007, Claudia Costa, Gibbs' Non-Attorney Representative, wrote to ALJ Walsh requesting that "no weight be given to Ms. Clark's testimony as it is flawed" or, if any weight be given, "that Ms. Clark address [certain] issues . . . at a supplemental hearing." (R. 181-83.) Costa argued that there were fewer sedentary surveillance system monitors in the national and local economy than Clark testified to. (R. 182.) Costa also maintained that the identification numbers to which Clark testified were not in the DOT, Clark used the wrong number for bench assembly worker, and the jobs to which Clark testified were inappropriate for the hypothetical person posed by ALJ Walsh. (R. 181-82.) Costa also noted that although Clark classified a bench assembly worker as "sedentary, unskilled, SVP two" work (R. 398), the correct classification is light work (R. 182-83).

ALJ Walsh denied Gibbs' applications for disability insurance benefits and SSI benefits in a written decision on March 26, 2007. (R. 190-200.) ALJ Walsh reviewed the testimony from Gibbs' hearing and the medical evidence in the record. (R. 195-200.) ALJ Walsh noted that Gibbs "alleged that she cannot bend or climb stairs and is limited to standing for ten minutes at one time, sitting for fifteen to twenty minutes, and lifting five pounds." (R. 199.) ALJ Walsh pointed

out that Gibbs' treating pulmonologist Dr. Rahman concluded that Gibbs could sit and stand eight hours and could occasionally lift and carry up to twenty pounds. (R. 199.) ALJ Walsh determined that the "objective evidence [did] not show any abnormalities that would reach the level of the listings of Section 1.00," Musculoskeletal System. (R. 196.)

ALJ Walsh acknowledged that Gibbs testified that she had asthma with shortness of breath, but did not use a nebulizer. (R. 199.) ALJ Walsh noted that physical exams revealed that Gibbs' lungs were frequently clear and pulmonary function tests consistently revealed mild to moderate asthma. (R. 199.) ALJ Walsh stated that although Gibbs reported at her hearing and consultative exam a history of emergency room visits due to asthma, no records of any of these visits were provided. (R. 196.) ALJ Walsh determined that the record did not contain any "valid results of [a] pulmonary function test that would meet or medically equal Listings 3.02 or 3.03," dealing with respiratory systems. (R. 196.)

ALJ Walsh also noted that Gibbs testified that she had anxiety attacks twice a week. (R. 199.) ALJ Walsh stated, however, that the medical evidence did not include any recent psychiatric treatment and that "the consultative psychiatrist's report [was] consistent with the available evidence." (R. 199.) ALJ Walsh determined that although the record revealed that Gibbs had mild anxiety, which caused "mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace," it did not meet the "B" or "C" criterion of Listings 12.04 or 12.06, mental disorders. (R. 196.)

ALJ Walsh did not make any conclusions regarding Gibbs' alleged carpal tunnel syndrome or heart condition.  (See R. 193-200.)  ALJ Walsh merely noted that the results of Gibbs' July 29, 2004 cardiac catheterization were normal.  (R. 197.)

After considering Gibbs' statements to physicians, as well as the medical evidence, ALJ Walsh determined that Gibbs' "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."  (R. 199.)

After reviewing the evidence, ALJ Walsh performed the appropriate five step legal analysis, as follows: At the first step, ALJ Walsh found that Gibbs had not engaged in substantial gainful activity since July 21, 2000, Gibbs' claimed disability onset date.  (R. 195.)  At the second step, ALJ Walsh found that Gibbs' asthma, back and right knee pain and mild anxiety constituted severe impairments based upon medical evidence.  (R. 196.)  At the third step, ALJ Walsh found that while Gibbs had severe impairments, she did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 196.)  At the fourth step, ALJ Walsh found that Gibbs retained the residual functional capacity to perform "sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option and a reasonably clean air environment."  (R. 196.)  ALJ Walsh found that Gibbs could perform her past relevant work as a customer service representative, which he characterized as "sedentary SVP 2 work and would . . . allow for requirements of a sit/stand option, lifting a

maximum of five pounds, and a reasonable clean air environment." (R. 200.) ALJ Walsh concluded that Gibbs was not "under a disability, as defined in the Social Security Act, from July 21, 2000 through the date of this decision," and denied Gibbs' applications for disability insurance benefits and SSI benefits. (R. 200.)

On August 3, 2007, Gibbs' non-attorney representative Costa appealed ALJ Walsh's March 26, 2007 decision, asking the Appeals Council to reverse the decision or, in the alternative, remand the case for proper adjudication. (R. 176-78.) First, Costa argued that ALJ Walsh erroneously relied on flawed vocational expert testimony. (R. 177.) Costa referenced her March 7, 2007 letter in which she had claimed that Clark's testimony was inconsistent with the DOT, and the representative occupations were inconsistent with the hypothetical residual functional capacity posed by ALJ Walsh. (R. 177.) Costa asked for remand in order to clarify Clark's testimony. (R. 177.) Second, Costa argued that ALJ Walsh failed to consider all of Gibbs' functional limitations. (R. 177.) Costa specifically stated that Dr. Strauss' opinion (namely, Gibbs' need to lie down one hour each eight hours) supported a finding of disability. (R. 177.) Third, Costa argued that ALJ Walsh failed to follow remand orders by not obtaining any medical records from Dr. Enu nor discussing any treatment rendered by Dr. Enu, not obtaining medical records regarding an angioplasty or a stent, and not discussing Gibbs' cardiac condition. (R. 177-78.)

ALJ Walsh's decision became the final decision on August 25, 2007, when the Appeals Council found no reason to assume jurisdiction. (R. 172-75.) The Appeals Council responded to Gibbs' representative's August 3, 2007 letter as follows: First, ALJ Walsh found that

Gibbs had "the residual functional capacity to perform sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option in a reasonably clear air environment."  (R. 172.)  Clark testified that Gibbs could "perform her past work as a customer service representative with the limitations in the" residual functional capacity.  (R. 172.)  Second, although Dr. Strauss opined that Gibbs needed to lie down one hour during the day, other portions of Dr. Strauss' assessment as well as the assessments of Dr. Rahman and Dr. Masood supported the residual functional capacity in ALJ Walsh's decision.  (R. 172.).  Third, pursuant to the remand order, the record contained the operative report of Gibbs' lung mass removal, pulmonary function test results, Dr. Masood and Dr. Rahman's diagnoses and opinions, and the results of the cardiac catheterization  (R. 172-73.)  Additionally, Dr. Enu treated Gibbs in the past[10] and his treatment records were in Gibbs' prior file, and are relevant to the prior (unappealed) July 15, 2002 decision denying benefits.  (R. 173.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A),

---

[10]    Gibbs' "Disability Report-Adult" dated March 12, 2003 (R. 50-59) indicated that she had last seen Dr. Enu in 2001 and had no further appointments scheduled with him (R. 53, 66).  2001 was before Gibbs' eligibility date for DIB or SSI benefits.

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Betances v. Comm'r of Soc. Sec., 206

Fed. Appx. 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 Fed. Appx. 37, 39 (2d Cir.

2006); Rodriguez v. Barnhart, 163 Fed. Appx. 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 Fed.

Appx. 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on

other grounds, 416 F.3d 101 (2d Cir. 2005).[11]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)(B), 1382c(a)(3)(B)(G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124

S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Betances v. Comm'r of Soc.

Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at

472.[12]

---

[11]    See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[12]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;  (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[13]

B.    **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 127 S. Ct. 2981 (2007); Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004), Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); 42 U.S.C. § 405(g).[14]  "'Thus, the role of

---

[13]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); Rivas v. Barnhart, 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005).

[14]    See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 Fed. Appx. 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 Fed. Appx. 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983); Rodriguez v. Barnhart, 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), aff'd, 163 Fed. Appx. 15 (2d Cir. 2005).

the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhardt, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[15]/

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[16]/ "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[17]/ However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g.,

---

[15]/     See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

[16]/     See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[17]/     See also, e.g., Colling v. Barnhart, 254 Fed. Appx. 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see

also, e.g., Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d

101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-

25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291

(1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II),
> 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-
> step sequential evaluation process to determine disability.  See 20 CFR § 404.1520
> (2003) (governing claims for disability insurance benefits); § 416.920 (parallel
> regulation governing claims for Supplemental Security Income).  If at any step a
> finding of disability or non-disability can be made, the SSA will not review the claim
> further.  [1] At the first step, the agency will find non-disability unless the claimant
> shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b),
> 416.920(b).  [2] At step two, the SSA will find non-disability unless the claimant
> shows that he has a "severe impairment," defined as "any impairment or combination
> of impairments which significantly limits [the claimant's] physical or mental ability
> to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the
> agency determines whether the impairment which enabled the claimant to survive
> step two is on the list of impairments presumed severe enough to render one disabled;
> if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's
> impairment is not on the list, the inquiry proceeds to step four, at which the SSA
> assesses whether the claimant can do his previous work; unless he shows that he
> cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth
> stage, the fifth, and final, step requires the SSA to consider so-called "vocational
> factors" (the claimant's age, education, and past work experience), and to determine
> whether the claimant is capable of performing other jobs existing in significant
> numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f),
> 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[18] accord, e.g., Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[19]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[20]

---

[18]     Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2. The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. See 68 Fed. Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (See pages 21-24 above.)

[19]     See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[20]     See also, e.g., Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. at 643; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Curry v. Apfel, 209 F.3d at 122; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

### C.    The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Colling v. Barnhart, 254 Fed. Appx. 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 Fed. Appx. 361, 362 (2d Cir. 2006).[21]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be

---

[21]    See also, e.g., Foxman v. Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 Fed. Appx. 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 Fed. Appx. 306, 308 (2d Cir 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

significant. 20 C.F.R. § 404.1527(d)(2); see, e.g., Foxman v. Barnhart, 157 Fed. Appx. at 346-47;

Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d

at 118; Schaal v. Apfel, 134 F.3d at 503.[22/]

   The Commissioner's "treating physician" regulations were approved by the Second

Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II. THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE, BECAUSE GIBBS' COMPLAINT IS CONCLUSORY AND SHE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION[23/]

---

[22/] See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

[23/] For additional decisions by this Judge discussing the grant of judgment on the pleadings to the Government in Social Security cases where the plaintiff has filed no opposing papers (or only conclusory papers) in language substantially similar to that in this entire section of this Report and Recommendation, see, e.g., Anderson v. Astrue, 07 Civ. 7195, 2008 WL 655605 at *9-10 (S.D.N.Y. Mar. 12, 2008), report & rec. adopted, 2008 WL 2463885 (S.D.N.Y. June 18, 2008); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *10-11 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); Feliciano v. Barnhart, 04 Civ. 9554, 2005 WL 1693835 at *9-10 (S.D.N.Y. July 21, 2005) (Peck, M.J.); Morgan v. Barnhart, 04 Civ. 6024, 2005 WL 925594 at *9-10 (S.D.N.Y. Apr. 21, 2005) (Peck, M.J.), report & rec. adopted, 2007 WL 2609897 (S.D.N.Y. Sept. 5, 2007); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *8-9 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *9 (S.D.N.Y. July 8, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *6-8 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Morrel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at *7 (S.D.N.Y. July 11, 2001) (Peck, M.J.); Casiano v. Apfel, 39 F. Supp. 2d 326, 327-28 (S.D.N.Y. 1999) (Stein, D.J. & Peck, M.J.), aff'd mem., No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000).

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. See, e.g., Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("The claimant generally bears the burden of proving that she is disabled under the statute. . ."); Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981) ("It is well established that the burden of proving disability is on the claimant."); Dousewicz v. Harris, 646 F.2d 771, 772 (2d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established . . . , namely, 'the burden of sustaining the claim for benefits is on the claimant' and 'The findings of the Social Security Agency are final and binding if there is a substantial basis for them.'").[24]

Here, Gibbs' pro se complaint states only that she should receive disability insurance benefits and SSI because of "COPD, anxiety, [and] lung sequesion [sic]." (Dkt. No. 2: Compl. ¶ 4.) Gibbs has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed. (See Dkt. Nos. 6 & 7: 1/14/08 & 2/25/08 Orders.) Thus, Gibbs does not point to any specific testimony or evidence which she believes ALJ Walsh overlooked or unjustly weighed. Gibbs' complaint is conclusory, and without more,

---

[24]  See also, e.g., Pena v. Barnhart, 01 Civ 502, 2002 WL 31487903 at *8 (S.D.N.Y. Oct. 29, 2002); Reyes v. Barnhart, 01 Civ 1724, 2002 WL 31385825 at *5 (S.D.N.Y. Oct. 21, 2002); Ortiz v. Shalala, 93 Civ. 3561, 1994 WL 673630 at *1 (S.D.N.Y. Dec. 1, 1994); Morton v. Heckler, 586 F. Supp. 110, 111 (W.D.N.Y. 1984); Harvey L. McCormick, Soc. Sec. Claims & Proc. § 14:16 (5th ed. 1998) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention.  The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure. . . . ").

insufficient to defeat the Commissioner's motion for judgment on the pleadings.  See cases cited in

fn.23 above; see also, e.g., Loper v. Barnhart, No. 05-CV-6563, 2006 WL 1455480 at *2 (W.D.N.Y.

May 9, 2006) (citing my Alvarez decision); Winegard v. Barnhart, No. 02-CV-6231, 2006 WL

1455479 at *9-10 (W.D.N.Y. Apr. 5, 2006) (same);Reyes v. Barnhart, 01 Civ. 4059, 2004 WL

439495 at *3 (S.D.N.Y. Mar. 9, 2004) (following my decisions in Jiang, Alvarez and Morrel);

Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996) (Court rejects plaintiff's allegations

that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to

consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the

IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that

they are "broad and conclusory.  She offers no specific testimony or evidence which she believes that

the ALJ overlooked and should have considered."); Steiner v. Dowling, 914 F. Supp. 25, 28 n.1

(N.D.N.Y. 1995) (rejecting plaintiffs' argument that the State's social security regulations are too

restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs – providing only

a single conclusory paragraph in their Statement of Undisputed Facts . . . , and in their Attorney's

Affirmation. . . ."), aff'd, 76 F.3d 498 (2d Cir. 1996); see generally S.D.N.Y. Local Civil Rule 7.1

("all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth

the points and authorities relied upon in support of or in opposition to the motion . . . .  Willful

failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the

granting of a motion by default.").

III.    **APPLICATION OF THE FIVE STEP SEQUENCE TO GIBBS' CLAIMS**

   For the reasons set forth in Point II above, the Court need not apply the five-step sequence to Gibbs' claims. Even if the Court were to do so, however, the Commissioner's decision that Gibbs was not disabled should be affirmed since it is supported by substantial evidence.

  A.    **Gibbs Was Not Engaged in Substantial Gainful Activity**

   The first inquiry is whether Gibbs was engaged in substantial gainful activity after her applications for disability insurance benefits and SSI. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Walsh's conclusion that Gibbs was not engaged in substantial activity during the applicable time period (R. 195; see page 23 above) benefits Gibbs and is not disputed by the Commissioner. (See Dkt. No. 9: Comm'r Br. at 17.)

  B.    **Gibbs Demonstrated Severe Physical Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

   The next step of the analysis is to determine whether Gibbs proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

   . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5). The Second Circuit has warned that the step two analysis may not do more than "screen out <u>de minimis</u> claims." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." <u>Rosario</u> v. <u>Apfel</u>, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(C)). On the other hand, if the disability claim rises above the <u>de minimis</u> level, then the further analysis of step three and beyond must be undertaken. <u>See</u>, <u>e.g.</u>, <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" <u>Rosario</u> v. <u>Apfel</u>, 1999 WL 294727 at *5 (quoting <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Walsh determined that the medical evidence indicated that Gibbs' asthma, back and right knee pain, and mild anxiety were impairments that were severe within the meaning of the Regulations. (R. 196; <u>see</u> page 23 above.) These findings benefit Gibbs and are not disputed by the Commissioner. (<u>See</u> Dkt. No. 9: Comm'r Br. at 17-18.) The Court therefore proceeds to the third step of the five part analysis.

**C.    <u>Gibbs Did Not Have A Disability Listed in Appendix 1 of the Regulations</u>**

The third step of the five-part test requires a determination of whether Gibbs had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These

37

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Walsh found that while Gibbs' medical conditions were "severe," Gibbs "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 196.)  Appendix 1 provides a categorization of physical impairments, including the musculoskeletal, respiratory and cardiovascular systems, as well as mental disorders and malignant neoplastic diseases.  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 4.00, 12.00, 13.00.  At the hearing before ALJ Walsh, Gibbs' representative agreed that her impairments did not meet or exceed the Listings.  (R. 368; see page 6 above.)  The Court nevertheless will conduct a third step analysis.

**1.    Gibbs' Knee and Back Pain Do Not Satisfy Appendix 1**

Sections 1.02 and 1.04 outline the conditions required to establish disorders of the joint and spine.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.02, 1.04.  Gibbs' knee pain must qualify as "Major dysfunction of a joint" to constitute as an Appendix 1 impairment:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  "Inability to ambulate effectively" means

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P. App. 1, § 1.00(B)(2)(b)(1).  "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P. App. 1, § 1.00(B)(2)(b)(2).

ALJ Walsh found that Gibbs' right knee pain constituted a severe impairment but did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (See page 23 above.)  Dr. Bernanke testified at the February 28, 2007 administrative hearing that Gibbs would have some difficulty walking.  (See page 6 above.)  Gibbs indicated, however, that although she had experienced right knee pain since 2006, and sometimes had difficulty walking, she was able to go for walks or travel three blocks to the store.  (See pages 4-5 above.)  An April 8, 2003 examination by Dr. Polak found that while Gibbs walked with the assistance of a cane, Gibbs could walk without it.  (See page 7 above.)  On May 6, 2003, a consultative physician found

that Gibbs could walk about six hours in an eight hour day. (See page 8 above.) Doctors stated that

Gibbs would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 269,

275.) Indeed, Gibbs herself said she used public transportation (R. 83) and took the bus to see her

doctors (R. 169). Therefore, because Gibbs' knee pain did not seriously interfere with Gibbs' ability

to independently initiate, sustain or complete activities, it does not qualify as a major dysfunction

of the joint.

        In addition, Gibbs' back pain would have to qualify as a "Disorder[] of the spine" to

qualify as an Appendix 1 impairment. Specifically, an individual must have a disorder

> (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis,
> degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise
> of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or reflex loss and, if there
> is involvement of the lower back, positive straight-leg raising test (sitting and
> supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue
> biopsy, or by appropriate medically acceptable imaging, manifested by severe
> burning or painful dysesthesia, resulting in the need for changes in position or
> posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings
> on appropriate medically acceptable imaging, manifested by chronic nonradicular
> pain and weakness, and resulting in inability to ambulate effectively, as defined in
> 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.

      ALJ Walsh found that Gibbs' back pain constituted a severe impairment, but did not meet or medically equal a Listed impairment.  (See page 23 above.)  Gibbs was diagnosed with chronic back pain and  "[g]rade II spondylolisthesis of L5 over S1 with associated spondylolysis at the L5 level." (R. 94.)  Even if spondylolisthesis or spondylolysis qualifies as a disorder of the spine, there is no evidence that either was accompanied by the conditions listed in §1.04(A), (B) or (C).  As to subsection A, Dr. Strauss noted muscle atrophy and decreased motion (R. 265), and Dr. Polak noted "left lower lumbar pain, which radiate[d] to the left hip" (R. 96).  Dr. Polak, however, found that Gibbs had no difficulty transferring from a seated position on and off the examining table and that straight leg raising was negative.  (See page 7 above.)  In addition, Dr. Lathan found no limitation of motion and "straight leg raising negative bilaterally." (R. 223.)  In the absence of evidence indicating nerve root compression, sensory or reflex loss, and positive straight-leg testing, the presence of some muscle atrophy, limitation of motion and radiating pain is insufficient to the meet the Appendix 1 Listing.  See, e.g., Otts v. Comm'r of Soc. Sec., 249 Fed. Appx. 887, 889 (2d Cir. 2007) (plaintiff not disabled with a spinal disorder under §1.04(A) where plaintiff's treating physician found some decreased muscle strength,  motion and sensation in plaintiff's arm, but did not find nerve root compression); McKinney v. Astrue, No. 05-CV-0174, 2008 WL 312758 at *5 (N.D.N.Y. Feb. 1, 2008) (plaintiff not disabled under § 1.04(A) where plaintiff did not satisfy "the combination of all symptoms as well as evidence of a compromised nerve root or spinal cord").

As to subsection B, although Dr. Strauss found that, during an eight hour day, Gibbs could sit continuously one hour in a normal seated position and stand continuously thirty minutes at a work station without moving (see page 11 above),[25] there is no evidence in the record of Gibbs being diagnosed with spinal arachnoiditis, manifested by severe burning or painful dysesthesia. In the absence of evidence indicating spinal arachnoiditis, the need for changes in position or posture more than once every two hours is insufficient to satisfy § 1.04(B).

As to subsection C, there is no evidence in the record of Gibbs being diagnosed with lumbar spine stenosis. In addition, the medical evidence and hearing testimony demonstrated that Gibbs' back pain did not interfere with the Gibbs' ability to independently initiate, sustain or complete activities. (See pages 5, 8, 9, 10 above.) As a result, Gibbs' spondylolisthesis or spondylolysis would not qualify as an Appendix 1 disability.

Substantial evidence supports ALJ Walsh's determination that Gibbs' knee and back pain did not equal one of the impairments listed in Appendix 1.

## 2.    Gibbs' Lung-Related Issues Do Not Satisfy Appendix 1

In order to qualify for a disability, a claimant must suffer from chronic asthmatic bronchitis or asthma attacks. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.03. Gibbs suffered from bronchial asthma (see pages 13-14 above), which is defined as "[c]hronic obstructive pulmonary

---

[25]    In contrast to Dr. Strauss' finding, the May 2003 consultative physician report noted that Gibbs could sit, stand or walk about six hours in an eight hour day (see page 8 above), and treating physician Dr. Rahman concluded that, during an eight hour day, Gibbs could sit continuously in a normal seated position eight hours and stand continuously at a work station without moving eight hours (see pages 14-15 above).

disease, due to any cause, with the $FEV_1$ [Forced Expiratory Volume in one second] equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02(A).  On April 8, 2003, June 15, 2004 and June 26, 2006,  doctors performed a pulmonary function test called a spirometry to determine the severity of Gibbs' condition (R. 95, 225-30, 335-37); the results confirmed that Gibbs' asthma was not severe enough to qualify as an Appendix I disability.[26]

Additionally, Gibbs' lung mass does not qualify as an Appendix 1 impairment.  The closest C.F.R. provision regarding lungs requires: "A. Non-small-cell carcinoma–inoperable, unresectable, recurrent, or metastatic disease to or beyond the hilar nodes" or "B. Small-cell (oat cell) carcinoma." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 13.14.  To qualify for a disability, the impairment must be malignant.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 13.00.  In the instant case, the record shows that Gibbs' lung mass was not malignant.  On August 27, 2004, ten days after Gibbs underwent a right thoracotomy and a right lower lobectomy, Gibbs was diagnosed with "[r]ight lower lobe lung: intralopar sequestration, right lower lobe, with acute and chronic inflammation." (R. 321, 324, 327.)  The record, therefore, contains no medical evidence that Gibbs suffered from a malignant neoplastic disease.

---

[26]     The April 8, 2003, June 15, 2004 and June 26, 2006 spirometry results list Gibbs' height as sixty one, sixty, and sixty two inches, respectively. (R. 95, 225-30, 335-37.) Table I requires an $FEV_1$ equal to or less than 1.05 liters for someone sixty inches tall and  an $FEV_1$ equal to or less than 1.15 liters for someone sixty one to sixty three inches tall (20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02A, Table 1); the results of Gibbs' tests clearly exceed the maximum $FEV_1$ allowed to qualify Gibbs' asthma as an Appendix I listed disability.  (See pages 11, 12, 14 & nn.6-8 above.)

Substantial evidence supports ALJ Walsh's determination that Gibbs' asthma and other lung issues did not meet the requirements of the Listings.

### 3.     Gibbs' Anxiety Does Not Satisfy Appendix 1

In order to qualify for a disability, a claimant must suffer from an affective disorder or an anxiety related disorder. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Gibbs testified before ALJ Walsh at the February 2007 hearing that her anxiety had resolved by the time of the hearing. (R. 361; see page 5 above.)

Section 12.04 outlines the conditions required to establish affective disorders:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome . . . .

2. Manic syndrome . . . .

3. Bipolar syndrome . . . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04.

The medical evidence in the record demonstrates that Gibbs' anxiety did not rise to the level of severity necessary to qualify as a § 12.04 disability. As to subsection A, the record contains no medically documented persistence, either continuous or intermittent, of depressive syndrome, manic syndrome or bipolar syndrome. Dr. King reported that Gibbs' "[a]ffect was fairly well modulated, friendly, and appropriate," her "[m]ood was euthymic, not significantly depressed or anxious," and there were "no hallucinations, delusions, suicidal ideations, and ideas of reference or paranoid trends elicited." (R. 92.) As to subsection B, Dr. Nobel found that Gibbs had no restrictions of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of

deterioration.  (See pages 15-16 above.)  In fact, Gibbs testified that she cooks, cares for her cats, washes the dishes, does laundry, and helps her children with their homework.  (See page 5 above.)  Moreover, Dr. King opined that Gibbs "ha[d] a satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting."  (R. 93.)  As to subsection C, the record contains no evidence of a medically documented history of a chronic affective disorder of at least two years of duration.

Substantial evidence supports ALJ Walsh's determination that Gibbs' anxiety did not meet the requirements of the Listings.

In addition, section 12.06 outlines certain conditions required to demonstrate anxiety related disorders.  Anxiety is "either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.06.  The required level of severity "is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.06.

As to subsection 12.06(A), the record contains no medically documented findings of generalized persistent anxiety, a persistent irrational fear of a specific object, activity or situation,[27] recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent and intrusive

---

[27]    Although Gibbs reported a history of anxiety attacks whenever she boarded the subway, Gibbs testified at the February 28, 2007 hearing that the condition had resolved itself.  (See page 5 above.)

recollections of a traumatic experience.  See Schulte v. Apfel, No. 98-CV-422, 2000 WL 362025 at

*12 (W.D.N.Y. Mar. 31, 2000) (plaintiff's anxiety not disabling where no physician had opined that

the anxiety attacks "are 'severe' and 'manifested by a sudden unpredictable onset of intense

apprehension, fear, terror and sense of impending doom.'").  As to subsection 12.06(B), as noted

above, Dr. Nobel found that Gibbs had no difficulties in activities of daily living or maintaining

social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated

episodes of deterioration.  (See pages 15-16 above.)  As to subsection 12.06(C), Gibbs' own

statements and testimony showed that she shopped, used public transportation and took the bus to

see her doctors two to three times each week (see page 5 above); Gibbs thus could function

independently outside the area of her home.  ALJ Walsh correctly concluded that Gibbs' anxiety was

not disabling.  See Ruiz v. Apfel, 26 F. Supp. 2d 357, 368 (D. Conn. 1998) (plaintiff's anxiety not

disabling where "[t]he consultative psychiatrist [noted] the absence of symptoms resulting in a

complete inability to function independently outside the home," and there was no contrary evidence

from plaintiff's treating psychiatrist).

       Given the medical evidence and Gibbs' hearing testimony – and especially her

testimony that her anxiety had resolved by the time of the February 2007 hearing – substantial

evidence supports ALJ Walsh's determination that Gibbs' anxiety did not meet the Listing

requirements.

### 4.    Gibbs' Carpal Tunnel Syndrome Does Not Satisfy Appendix 1[28/]

Carpal tunnel syndrome does not specifically appear in the Listings.  Gibbs' carpal tunnel syndrome would have to qualify as a "Major dysfunction of a joint" to qualify as an impairment in Appendix 1:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With: . . .
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  "Inability to perform fine and gross movements" means:

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and

---

[28/]    Neither ALJ Greenberg nor ALJ Walsh discussed carpal tunnel syndrome.  (See pages 17-24 above.)  Federal courts, however, can review an impairment even if an ALJ did not discuss it.  See, e.g., Mendez v. Barnhart, 05 Civ. 10568, 2007 WL 186800 at *13 (S.D.N.Y. Jan. 23, 2007) ("In the absence of evidence showing that the ALJ failed to consider Mendez's carpal tunnel syndrome, the mere lack of a specific finding on that single impairment does not warrant remand."); Flors v. Massanari, 00 Civ. 5767, 2002 WL 100631 at *5 (S.D.N.Y. Jan. 25, 2002) ("The ALJ is not required to cite and discuss each and every symptom or illness claimed by a disability claimant, only to consider the effect of all of his impairments.  Plaintiff does not mention any way that his various ailments interfered with his ability to work that was not taken into account by the ALJ."); see also Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982) ("[T]he absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence.").

fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404, Subpt. P. App. 1, § 1.00(B)(2)(c).

Gibbs' carpal tunnel syndrome does not satisfy the Appendix 1 requirements. Although Gibbs claimed that she had carpal tunnel syndrome, and that, about once each day, she suffered about five minutes of numbness in her right hand, consultative and treating physician examinations established that Gibbs' carpal tunnel syndrome was not disabling: Dr. Polak's examination on April 8, 2003 found that Gibbs' finger and hand dexterity were intact, and that Gibbs had full use of both hands when dressing and undressing. (See page 16 above.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" indicated that Gibbs did not have any "manipulative limitations." (R. 102.) On April 28, 2006, treating physician Dr. Masood noted that during an eight hour day, Gibbs could frequently use either hand for repetitive action, such as handling, fingering and pushing and pulling arm controls. (See page 16 above.) On June 26, 2006, Dr. Lathan reported that Gibbs' "[h]and and finger dexterity [were] intact" and that her "[g]rip strength [was] 5/5 bilaterally." (R. 223.) Treating physician Dr. Strauss noted on September 5, 2006 that during an eight hour day, Gibbs could continuously use either hand for repetitive action. (See page 16 above.)

Because Gibbs' carpal tunnel syndrome did not seriously interfere with Gibbs' ability to independently initiate, sustain or complete activities, and therefore did not result in an inability

to perform fine and gross movements effectively, it does not qualify as a major dysfunction of the joint.

Substantial evidence supports that Gibbs' carpal tunnel syndrome did not meet the requirements of the Listings.

**5.      Gibbs' Heart Condition Does Not Satisfy Appendix 1**

Section 4.00 outlines certain conditions required to demonstrate a cardiovascular impairment.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00.  A cardiovascular impairment is defined as "any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage)."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(A)(1)(a).  Gibbs' heart condition would have to qualify as "Ischemic heart disease" to qualify as an Appendix 1 impairment:

> Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment . . . with one of the following . . .
>
> C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
>
> 1. Angiographic evidence . . . ; and
>
> 2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

50

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.04.   Section 4.00(E)(3)-(7) discusses the following symptoms due to myocardial ischemia: typical angina pectoris, atypical angina, anginal equivalent, variant angina and silent ischemia.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00.

The medical evidence in the record demonstrates that Gibbs' heart impairment did not rise to the level of severity necessary to qualify as a disability.  On July 22, 2004, a SPECT imaging of Gibbs' heart revealed a reversible anterolateral defect that could represent a "small zone of mild inducible ischemia estimated to encompass less than 5 percent of the left ventricular myocardium" or a "differential breast attenuation artifact." (R. 331, 333.)  On July 29, 2004, however, a left heart catheterization, left ventriculogram, coronary angiogram and lleo-femoral angiogram revealed normal coronary arteries and an unremarkable cardiac catheterization.  (See page 17 above.) Moreover, Dr. Lathan's June 26, 2006 examination found that Gibbs' heart had a regular rhythm and that "[n]o murmur, gallop or rub [was] audible." (R. 223.)

Because the medical evidence does not show coronary artery disease, Gibbs' heart impairment did not qualify as ischemic heart disease, and thus substantial evidence supports the determination that Gibbs' heart condition did not meet the requirements of the Listings.

*  *  *  *  *

The Court reiterates that both in post-hearing submissions to ALJ Walsh and to the Appeals Council, Gibbs' representative did not challenge ALJ Walsh's conclusion at step three that Gibbs' impairments did not meet any of the Listings.  (See pages 21, 24 above.)  To the contrary,

Gibbs' representative agreed at the hearing that Gibbs' impairments did not meet the Listings requirements.  (See page 6 above.)

**D.     Gibbs Had the Ability to Perform Her Past (Sedentary) Work (or Other Sedentary Work)**

The fourth prong of the five part analysis is whether Gibbs had the residual functional capacity to perform her past relevant work, that is, her work as a customer service representative. (See page 4 above.)   ALJ Walsh found that Gibbs had the residual functional capacity to perform sedentary work.  (R. 196.)  "Sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).  It is generally agreed by both the Commissioner and the Second Circuit that sedentary work involves sitting six hours out of an eight hour work day.  See, e.g., Ferraris v. Heckler, 728 F.2d 582, 587 n.3 (2d Cir. 1984); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *12 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.); Casiano v. Apfel, 39 F. Supp. 2d 326, 329 n.2 (S.D.N.Y. 1999) (Stein, D.J. & Peck, M.J.), aff'd mem., No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (Jan. 14, 2000); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.).

Gibbs' past relevant work as a customer service representative qualifies as "sedentary work"; Gibbs' job as a customer service representative involved answering phones, handling clients, collecting payments, no walking and lifting files weighing no more than ten pounds.  (See pages 4,

6 above.) ALJ Walsh found that Gibbs could perform "sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option and a reasonably clean air environment." (R. 196.)

ALJ Walsh's conclusion was supported by Gibbs' testimony and the opinions of treating and consultative physicians (except for one aspect of Dr. Strauss' opinion). Gibbs testified that she could sit for 30-60 minutes before needing to stand for five minutes or less, and could carry five pounds (and elsewhere she said 15 pounds). (See pages 4-5 above.) Consultative physician Dr. Polak found only mild impairment as to sitting/standing. (R. 97; see page 8 above.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" of Gibbs found she could sit, stand or walk about six hours in an eight hour day and that her allegations as to pain were "not credible." (R. 101, 104; see page 8 above.) HS Systems' February 2, 2004 report opined that Gibbs' back pain and asthma "should not interfere with [Gibbs'] ability to work." (R. 125; see pages 9, 12 above.) In June 2006, consultative physician Dr. Lathan found only a moderate restriction on stooping or prolonged standing and walking. (R. 224; see page 10 above.) On September 14, 2006, Gibbs' treating pulmonologist Dr. Rahman determined that Gibbs could sit or stand for eight hours and carry 11-20 pounds, and that Gibbs did not need to lie down during an eight hour day. (R. 279; see pages 14-15 above.)

The only somewhat contradictory evidence came from treating physician Dr. Strauss.[29/]  Dr. Strauss opined that Gibbs could sit continuously one hour in a normal seated position and stand continuously thirty minutes at a work station without moving in an eight hour day, but that Gibbs needed to lie down one hour every eight hours.  (See page 11 above.)  Dr. Strauss did not indicate for how long Gibbs could sit during an eight hour day.  (See page 11 above.)  His opinion as to her sitting and standing thus is consistent with Gibbs' own testimony that she could sit for 30-60 minutes and then stand for five minutes or less, and is consistent with the other medical opinions that she could sit/stand to perform sedentary work.

Dr. Strauss' opinion that Gibbs would need to lie down for an hour during an hour during an eight hour work day, however, is inconsistent with the ability to perform sedentary work, as vocational expert Clark admitted in response to a hypothetical question.  (See page 7 above.)  Dr. Strauss, however, provided no medical or other explanation for this part of his opinion.  Moreover, another of Gibbs' treating physicians, Dr. Rahman, specifically contradicted Dr. Strauss; Dr. Rahman opined that Gibbs would not need to lie down.  (R. 279; see page 15 above.)  No other treating or consultative physician opined that Gibbs needed to lie down.  ALJ Walsh properly could have relied on Dr. Rahman and the other evidence over the unsupported opinion of Dr. Strauss about Gibbs' need to lie down.  This Court concludes that "the substance of the treating physician rule was

---

[29/]    ALJ Walsh did not explicitly acknowledge the "treating physician rule"or state why Dr. Strauss' opinion was not entitled to controlling weight.  (See pages 21-24 above.)  This Court, however, has conducted "a searching review of the record to assure [that Gibbs] received the rule's procedural advantages," see, e.g., Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004), and finds that ALJ Walsh's decision is supported by substantial evidence.

54

not traversed." Halloran v. Barnhart, 362 F.3d at 32; see also, e.g., Klodzinski v. Astrue, No. 07-1752, 2008 WL 1813222 at *2 (2d Cir. Apr. 23, 2008) (holding that the ALJ applied the substance of the treating physician rule even where the ALJ did not explicitly state in his written opinion that he was rejecting the plaintiff's treating physician's opinion and did not explain the reasons for doing so).

Substantial medical and functional capacity evidence supported ALJ Walsh's conclusion that Gibbs was capable of resuming her former employment as a customer service representative, a sedentary job.

Because Gibbs did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step. See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").[30]  Even if the Court were to proceed to step 5, however, ALJ Walsh's conclusion is supported by substantial evidence, including the testimony of a vocational expert. (See pages 6-7 above.)[31]

---

[30]    Accord, e.g., Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Papp v. Comm'r of Soc. Sec., 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); & Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. April 11, 1995)).

[31]    A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to  perform any of those jobs.  20 C.F.R.

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only [her] physical capability, but as well [her] age, [her] education, [her] experience and [her] training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

In meeting his burden under the fifth step, the Commissioner ordinarily will make use of the "Grid":

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

---

§§ 404.1566(e), 416.966(e); see, e.g., Butts v. Barnhart, 416 F.3d 101, 103-04 (2d Cir. 2005); Taylor v. Barnhart, 83 Fed. Appx. 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 Fed. Appx. 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); Quezada v. Barnhart, 2007 WL 1723615 at *13 n.20; Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); de Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, Edna Clarke . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fns. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid classifies work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567(a).  Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

Using the Grid, a person of Gibbs' age (forty-nine)[32/] (R. 164, 353), education (high school graduate) and ability to perform sedentary work is not disabled for purposes of Social Security benefits.  20 C.F.R. Part 404, Subpt. P, App. 2, §§ 201.00(h), 201.22.  The conclusion under the Grid also was supported by vocational expert Clark's testimony.  (See pages 6-7 above.)  See also 20 C.F.R. §§ 416.945-.969a.

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Gibbs was not disabled within the meaning of the Social Security Act is supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 8) should be GRANTED.

---

[32/]    Gibbs, who was born on June 30, 1957 (see page 4 above), was 49 on March 26, 2007, the date on which ALJ Walsh rendered his decision.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

Dated:     New York, New York
           July 2, 2008

Respectfully submitted,

Andrew J. Peck
United States Magistrate Judge

Copies to:   Cheryl Gibbs (Regular & Certified Mail)
             Susan C. Branagan, Esq.
             Judge George B. Daniels

H:\OPIN\GIBBS